UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DARYL JACKSON,                                    :

                    Petitioner,                   :          07 Civ.  9390 (WHP) (AJP)

          -against-                               :          **REPORT AND RECOMMENDATION**

MARK BRADT, Acting Superintendent,                :
Attica Correctional Facility,
                                                  :

                    Respondent.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable William H. Pauley, United States District Judge:**

    Pro se petitioner Daryl Jackson seeks a writ of habeas corpus from his July 24, 2002

conviction after a jury trial in Supreme Court, New York County, of second degree burglary, and

sentence as a second violent felony offender to thirteen years imprisonment. (Dkt. No. 1: Pet. ¶¶ 3-5;

Dkt. No. 12: State Br. at 1.)  Jackson's habeas petition asserts that:  (1) Jackson was mentally

incompetent and should have been given a competency hearing prior to his retrial (Pet. ¶ 13 & at 1-

10); (2) the trial court erred when it denied Jackson's counsel's request to charge the jury that the

prosecution was required to prove Jackson's specific intent to commit larceny (Pet. ¶ 13 at 11-29);

(3) Jackson's constitutional rights were violated when the prosecution introduced an altered

surveillance video from a prior incident, not the date of the crime charged (Pet. ¶ 13 at 29-31);

(4) Jackson's constitutional rights were violated when the prosecution produced a false witness (Pet. ¶ 13 at 31-33); and (5) Jackson's constitutional rights were violated when the prosecution presented misleading photos of Room 829 that prejudiced the jury (Pet. ¶ 13 at 33-42). (See also Dkt. No. 15: Jackson Traverse.)

        For the reasons set forth below, Jackson's habeas petition should be DENIED.

## FACTS

        Jackson's conviction arose from a September 7, 1999 incident at the Phillips Club hotel and residence near Lincoln Center in Manhattan. (Dkt. No. 1: Pet. ¶ 5; Pet. Ex. A: Jackson 1st Dep't Br. at 2-3; Dkt. No. 12: State Br. at 2, 4-6, 8-11.) Prior to Jackson's first trial, he underwent two Criminal Procedure Law ("C.P.L.") § 730.30 mental competency examinations and was committed to a psychiatric hospital from August 2000 to February 2001, after which Jackson was deemed fit to proceed. (See State Br. at 24; Dkt. No. 9: Rodriguez Aff. Ex. I: Justice Stone Decision at 5.) In March 2000, Jackson's first trial ended in a mistrial because of a hung jury. (Jackson 1st Dep't Br. at 5 n.2; State Br. at 2.) Jackson was retried in December 2001 before a jury, with Justice Rosalyn Richter presiding. (State Br. at 2, 24 n.11.)

## The Prosecution's Case at Trial

        On the morning of November 2, 1998, security guards found Jackson in the basement of the Phillips Club, a hotel and short-term residential building located near Lincoln Center in Manhattan. (Dkt. No. 10: Ortiz: Trial Transcript ["Tr."] 39-40, 45, 49-50.) The police were called and at their suggestion, Rafael Ortiz, the hotel manager on duty, prepared a written notice informing

3

Jackson that he was not permitted to visit the premises again. (Ortiz: Tr. 43-44, 54-56.) The notice indicated that if Jackson entered the buildings identified as 1965 Broadway, 111 West 67th Street, and 150 Columbus Avenue, he would be charged with burglary. (Ortiz: Tr. 57-58, 84-85, 102-03.) The police and the Phillips Club staff read the notice to Jackson, who indicated that he understood the warning. (Ortiz: Tr. 55-56, 59-60.) The notice did not include the name "Phillips Club." (Ortiz: Tr. 57, 85; Tennant: Tr. 191-94.) Jackson received a copy of the notice and left the hotel. (Ortiz: Tr. 59-60.) After Jackson left, Ortiz reviewed the tapes from the Phillips Club's security cameras. (Ortiz: Tr. 61-63.)[1]

On September 7, 1999, doorman Alla Elhadedy and concierge Joy Bondoc were working at the 155 West 66th Street entrance of the Phillips Club. (Elhadedy: Tr. 106, 108; Bondoc: Tr. 210-11.) At about 6:50 a.m., they saw Jackson leaving the building through an emergency exit on West 66th Street. (Elhadedy: Tr. 108-10, 115-16, 132-33; Bondoc: Tr. 212-13.) Elhadedy saw Jackson carrying something wrapped in a shower curtain. (Elhadedy: Tr.110, 115, 122-23.) Bondoc saw Jackson carrying "a pink something." (Bondoc: Tr. 213, 216.) Elhadedy stopped Jackson and asked him what he was carrying and where he was coming from. (Elhadedy: Tr. 115-16.) Jackson

---

[1]    The tapes showed Jackson outside a service entrance on 67th Street. (Ortiz: Tr. 73-74.) Jackson tried to enter the building, but a security guard stopped him and escorted him out. (Ortiz: Tr. 74-75.) At 8:17 a.m., Jackson entered the building through the lobby while walking behind a rolling luggage cart. (Ortiz: Tr. 75.) At 8:24 a.m., Jackson got on an elevator on the ninth floor and shortly afterwards got off at the penthouse level. (Ortiz: Tr. 75-77.) At 8:26 a.m., the video showed Jackson on the eighth floor. (Ortiz: Tr. 77.) At 8:31 a.m., Jackson exited a stairwell in the hotel's basement, where a maintenance man stopped him and apprehended him. (Rafael Ortiz: Tr. 77-78.)

H:\OPIN\JACKSON-Daryl

responded that he came from downstairs and that the item Jackson was carrying belonged to him. (Elhadedy: Tr. 123.)  Elhadedy asked Jackson for identification, and Jackson replied that he had none.  (Elhadedy: Tr. 123.)  Elhadedy told Jackson that he would have to go back inside the hotel with Elhadedy. (Elhadedy: Tr. 123.)  Jackson then produced a driver's license.  (Elhadedy: Tr. 123-24.)  Elhadedy escorted Jackson into the hotel and handed Jackson's driver's license to someone at the front desk.  (Elhadedy: Tr. 124-25, 133; Bondoc: Tr. 213-14.)  Bondoc called the police. (Elhadedy: Tr. 124-25; Bondoc: Tr. 215-16.)

Hotel security officer Rafael Negron came to the lobby in response to an "alert," and recognized Jackson from the November 2, 1998 incident.  (Elhadedy: Tr. 126; Bondoc: Tr. 214-15.) Negron said, "you here again?"  (Elhadedy: Tr. 126.)  Jackson dropped the item he was carrying and ran into the revolving door to leave the hotel.  (Elhadedy: Tr. 127-28.)  Elhadedy placed his foot in the door to prevent Jackson from escaping.  (Elhadedy: Tr. 129.)  Jackson began to yell as he tried to get out of the hotel.  (Bondoc: Tr. 214-15.)

Police Officer Mark Bakunas responded to the call from the Phillips Club at about 6:55 a.m.  (Bakunas: Tr. 137-39; Elhadedy: Tr. 129.)  Officer Bakunas spoke to Elhadedy and Negron, and saw Jackson in the custody of hotel security guards.  (Bakunas: Tr. 140.)  Officer Bakunas thought that Jackson appeared intoxicated and testified that Jackson later admitted to having smoked marijuana and crack.  (Bakunas: Tr. 149-53.)  Someone unwrapped the shower curtain that Jackson had been carrying and found a VCR and remote control inside.  (Bakunas: Tr. 141.)  Officer Bakunas arrested Jackson and took him to the station house.  (Bakunas: Tr. 140-41.)

Alan Tennant was the general manager of the Philips Club in 1999.  (Tennant: Tr. 166.)  When Tennant arrived at around 7:20 a.m. on the date of the incident, he was informed that there had been an intruder, and he began a floor-to-floor search of the hotel beginning at the top floor.  (Tennant: Tr. 174-76.)  On the eighth floor, Tennant noticed the door to room 829 slightly ajar.  (Tennant: Tr. 181.)  Room 829 was an unoccupied, fully furnished one-bedroom apartment.  (Tennant: Tr. 177-87.)[2]  Tennant entered the apartment and saw loose wires in a television cabinet where a VCR should have been but there was no VCR in the room.  (Tennant: Tr. 177-78.) Tennant also noticed that the shower curtain was missing.  (Tennant: Tr. 179.)  Hotel records confirmed that a VCR was installed in room 829 on August 15, 1999.  (Tennant: Tr. 180.)  Jackson did not have permission to be inside the Phillips Club that day or to take the VCR from the hotel.  (Tennant: Tr. 190-91.)

**Jackson's Case at Trial**

Jackson was the sole witness to testify on his behalf.  (See generally Dkt. No. 10: Jackson: Tr. 219-60, 323-41, 359-517.)

At the time of trial, Jackson was thirty-four years old; he admitted to having three prior felony convictions and three prior misdemeanor convictions, and admitted that he had used other names when previously arrested.  (Jackson: Tr. 219, 221-23, 238-41.) Jackson lived in a rented room in Queens paid for by his brother and had worked for five months for a company that installed

---

[2]     Tennant identified photographs of Room 829, taken in his presence, and the photographs were admitted into evidence.  (Tennant: Tr. 172-74.)

fire extinguishers in office buildings.  (Jackson: Tr. 219-20, 243.)  Although Jackson admitted to smoking marijuana beginning in 1978 and crack-cocaine beginning in 1986 (Jackson: Tr. 223, 250-52), Jackson had been drug free for two and a half years at the time of his trial.  (Jackson: Tr. 223, 249-50.)

   As of November 2, 1998, Jackson had lost his apartment, his job and his girlfriend and was using a lot of drugs.  (Jackson: Tr. 247, 257-59, 327-29.)  On the morning of November 2, 1998, Jackson purchased crack and some cigars, and after hollowing one out, filled it with crack and marijuana.  (Jackson: Tr. 224, 334-39, 361.)  Jackson had trouble lighting the cigar because of the wind, so he tried to enter the Phillips Club but was stopped by a security guard.  (Jackson: Tr. 224-25, 366-67, 372-75.)  Jackson walked around the corner and entered what he thought was a museum, because of a change in architecture.  (Jackson: Tr. 225, 375-76, 381.)  Jackson walked directly into the elevators without anyone stopping him.  (Jackson: Tr. 225, 375-79, 382.)  He was high at the time.  (Jackson: Tr. 225, 382-88.)  He took the elevator to the fourth floor where he broke open another cigar, removed the tobacco, and filled it with crack.  (Jackson: Tr. 225, 384-85.)  Jackson walked around different floors of the building smoking the crack-filled cigar.  (Jackson: Tr. 225-26, 387-88, 391-93.)  Jackson ended up in the basement, where he was confronted by a building employee and taken to a security office.  (Jackson: Tr. 226, 395.)

   In the office, security guard Ortiz threatened Jackson with bodily harm, and Jackson's high was wearing off.  (Jackson: Tr. 226-28, 397.)  The police had Jackson sign a form that warned Jackson to stay away from three different addresses but that did not mention the Phillips Club by

name.  (Jackson: Tr. 227, 395.)  Jackson signed the form and the police issued him a summons for trespassing.  (Jackson: Tr. 227-29.)  Jackson believed that the summons was never prosecuted.  (Jackson: Tr. 228-29.)  Jackson left the building and stated that he did not want to return because of Ortiz's physical threats.  (Jackson: Tr. 229, 397-98.)

As of September 7, 1999, Jackson had been high for three days straight and had not slept for much of that time.  (Jackson: Tr. 229-30, 398, 403-04.)  At some point that day, Jackson entered the Phillips Club through what he believed was the front entrance on 66th Street, which was not one of the addresses listed on the warning notice Jackson received on November 2, 1998.  (Jackson: Tr. 227, 230-32, 420-21, 432, 453.)  Jackson was looking for a place to sleep and thought that the building would be warm since it was an apartment building.  (Jackson: Tr. 232, 421, 430, 454.)  Jackson entered the building with his head down so that he would not be noticed.  (Jackson: Tr. 433, 436-37, 453.)  Once inside the building, Jackson looked for a place to sleep.  (Jackson: Tr. 232, 454-61.)  At one point he smoked a cigar that had been hollowed and filled with crack or marijuana.  (Jackson: Tr. 232, 460.)

Jackson saw that the door to Room 829 was slightly ajar.  (Jackson: Tr. 233, 461-63.)  Jackson knocked but heard no answer, so he went in looking for a place to sleep.  (Jackson: Tr. 233, 462, 464-65.)  The room had no curtains on the window, no sheets on the bed, was very dusty, and did not look like anyone lived there.  (Jackson: Tr. 233-34, 462, 465-67.)  Jackson went into the kitchen and saw that there were no appliances or silverware.  (Jackson: Tr. 466, 475-76.)  Jackson saw a television cabinet containing a VCR and decided to take it and sell it for money to buy more

drugs. (Jackson: Tr. 234, 469, 485-86.) Jackson thought that someone had moved out of the apartment and left the VCR behind. (Jackson: Tr. 235, 460, 466, 470, 474-75.) Jackson decided to get some sleep before he took the VCR and looked around the room for a blanket to use. (Jackson: Tr. 234, 472.) Jackson was unable to find any sheets or pillowcases so he pulled down the shower curtain intending to use it as a blanket. (Jackson: Tr. 234, 467-68, 470-72.) When Jackson realized the plastic shower curtain would not keep him warm, he decided to leave the room with the VCR wrapped in the shower curtain. (Jackson: Tr. 234-35, 471-74, 479.)

Jackson tried to take the elevator to the first floor but ended up in the basement. (Jackson: Tr. 234-35, 471, 480-81.) Jackson left the basement through an exit that led directly to the street, where he was confronted by the doorman Elhadedy. (Jackson: Tr. 235, 471, 480-81.) Elhadedy asked Jackson if he worked in the building and Jackson said he did not. (Jackson: Tr. 235, 471, 480-81, 487.) Elhadedy asked Jackson for identification and brought him inside the building. (Jackson: Tr. 235, 471, 481-82.) Jackson gave Elhadedy his driver's license and Elhadedy gave it to a woman to photocopy. (Jackson: Tr. 236, 487-88.) When Elhadedy asked what was in the shower curtain, Jackson showed him the VCR. (Jackson: Tr. 236, 482.)

Security Officer Negron arrived and recognized Jackson; Negron told Jackson that he had been warned not to enter the Phillips Club and that Jackson was going to jail for trespassing. (Jackson: Tr. 236, 489.) Jackson began yelling, insisting that he did not know the building was the Phillips Club or that the VCR belonged to the hotel. (Jackson: Tr. 236, 489.) Jackson tried to escape and dropped the VCR. (Jackson: Tr. 490-91.) Eventually, the police arrived and arrested Jackson.

(Jackson: Tr. 237, 491.)  At the station house, Jackson told police in a written statement that he found the VCR in the basement wrapped in sheets.  (Jackson: Tr. 498.)  Jackson admitted at trial that this was a lie.  (Jackson: Tr. 498, 500, 508-11.)  Jackson testified that when he went into the Phillips Club and when he went into Room 829, he did not intend to steal anything.  (Jackson: Tr. 237.)

The defense rested after Jackson's testimony.  (Tr. 514.)

**The Jury Charge**

Justice Richter conducted an initial charge conference during a break in the prosecution's cross-examination of Jackson, and the following colloquy occurred:

MR. HEILBRUN [DEFENSE COUNSEL]:  Are you planning to specify the crime that [Jackson] intended to commit as theft.

THE COURT:  The charge does not so require.

MR. HEILBRUN:  Here is my only question in that regard.  I'm worried that some juror might say, oh, well, why don't we just convict him because he went in there planning to get high or he went in there with a blunt and I want them to understand that there's a prosecution theory that he went in there to steal and he may not be convicted of burglary because he went in there to get high. . . .

THE COURT: Were the People planning to make any such argument?

[A.D.A.] WALLACH:  No, Judge.

. . . .

MR. HEILBRUN:  There have been cases where jurors have been interviewed in my office where they convicted individuals of burglary because they thought they committed one by carrying drugs into a building.

[A.D.A.] WALLACH:  As counsel had noted the statute doesn't require that we specify nor should the Court instruct them.

THE COURT: Let me tell you what we're doing here and what I'm not doing. You're making your charge requests. You'll be heard. You're entitled to know generally before summation what charges and what counts I'm submitting. You're not entitled to a ruling on every word. . . .

I understand [defense counsel's] concern and I'm happy before I give you the charge to consider it. But my inclination is not that – but I'm willing to note them all . . . – rather than rule on all of them now.

(Dkt. No. 10: Tr. 447-49.) After a lunch break, Justice Richter again raised the issue of Jackson's charge request:

THE COURT: There is actually case law dealing with when I have to give a charge on whether or not the defendant entered with the intent to commit a specific crime and it deals with what's in the VDF, we don't have to deal with that now.

My sense was the People weren't planning to structure the rest of your cross so that you could argue on summation the defendant entered with the intent to use narcotics. You're sticking with the theft theory?

[A.D.A.] WALLACH: Yes. Nor do I believe that continued possession of narcotics could provide the basis for the crime.

MR. HEILBRUN [DEFENSE COUNSEL]: I agree.

THE COURT: Fine. I just wanted to make sure. And we can worry about the wording of the charge. I just wanted to tell the parties that so in case it did affect your cross . . . .

(Tr. 451-52.)

Following the close of the evidence, Justice Richter returned to the charge issue:

THE COURT: After a little research over lunch, I do want to alert the parties that there is actually a Court of Appeals case, . . . that indicates if the bill of particulars . . . had specified the crime the defendant intended to commit I would be required to add that into the charge. I don't see it, but I wondered if the people had any objection because I think there could be a possibility of confusion here with the jury thinking somehow that ongoing narcotics possession might be a crime.

(Tr. 524.)  The prosecutor objected to the inclusion of a specific crime on the ground that "it wasn't a requirement of the People to prove that," but the prosecutor also indicated that he would not argue that Jackson intended to commit any crime other than theft.  (Tr. 524-25.)  Defense counsel again expressed his concern regarding a conviction based on a theory of narcotics possession:

> MR. HEILBRUN [DEFENSE COUNSEL]:  Judge, I'm going to ask you to specify the crime, and although I do believe the prosecutor does not intend to argue any other crime, and I have seen cases, and Legal Aid has loads of cases where jurors convict on facts similar to this because they think entering with drugs is a burglary and I want something in the charge that will make clear to the jury that they will not do that.  It may be your Honor instructing them you may not convict the defendant on burglary simply because he entered the premises with drugs.

(Tr. 525.)  Justice Richter replied that she "will not tell the jury what they can't convict on.  That raises an issue that may never have crossed anyone's mind."  (Tr. 525.)

Defense counsel also objected to the submission of both counts of the indictment to the jury – one count for entering the Phillips Club building, and another count for entering Room 829.  (Tr. 527-33.)  Defense counsel argued that Jackson could not illegally enter the building itself with the intent to commit a crime, somehow gain legal status once inside the building, and separately enter Room 829 as a trespasser with the intent to commit a crime.  (Tr. 527-28.)  The prosecutor argued that the two counts were meant to be alternatives to each other, and that "there could be a reasonable view of the evidence that the defendant – when he first walked into the building may have intended to sleep.  However, when he got up to the eighth floor and entered the room [he] was then intending to steal something."  (Tr. 529.)  After further discussion, the prosecutor conceded that a conviction on both counts was possible.  (Tr. 531-32.)  Defense counsel's main concern was that the

12

two counts gave the People "two bites at the apple" (Tr. 550), and that "[the jury] may think, let's split the baby and acquit him of going into the building, but convict him of going into the room" (Tr. 549).

Justice Richter's jury charge did not specify a specific criminal intent,[3] and included both counts of the indictment.  (Charge: Tr. 672, 683-84, 688-702.)  At the conclusion of the charge, defense counsel again objected to submission of the two counts and not specifying the crime.  (Tr. 702-14.)  Justice Richter considered the objection and gave the following supplemental instructions to the jury to clarify any confusion that arose from the second count:

> THE COURT: [A]s it relates to count two, which you know is the burglary charge relating to the room, you must determine whether the entire building, including the lobby, is closed to the public.
>
> If you find that the entire building is closed to the public, then before you could convict the defendant of burglary under this count, you would have to find from the evidence that it has been established beyond a reasonable doubt that he had the intent to commit a crime when he entered the building.
>
> If you find from the evidence in this case that the lobby of the building was open to the public and that other areas of the building were not open the public, then before you could convict the defendant of burglary under count two, you would have to find that it has been established from the evidence beyond a reasonable doubt that when he left the lobby he did so with the intent to commit a crime in a non-public area of the building.

(Tr. 722-23.)

---

[3]    The jury sent a question regarding intent during their deliberations.  (Tr. 724, 727.)  Justice Richter responded that "the People must establish beyond a reasonable doubt that the defendant had the intent to commit any crime, not specifically the crime of taking the VCR . . . . But that intent to commit any crime cannot include the crime of simply possessing drugs."  (Tr. 739.)

H:\OPIN\JACKSON-Daryl

**Verdict and Sentencing**

The jury convicted Jackson of both counts of second degree burglary. (Dkt. No. 10: Tr. 787-88.)

When Jackson heard the verdict, he punched his attorney in the face and struggled with several court officers before he was forcibly removed from the courtroom. (Tr. 788-89.) The jurors were escorted from the courtroom. (See Tr. 789; Dkt. No. 12: State Br. at 11.) Before the jurors returned, Justice Richter spoke to them twice to calm them down without Jackson, defense counsel or the prosecutor present. (Tr. 789-90; see State Br. at 11.) Justice Richter put the following on the record in the presence of the prosecutor and defense counsel, but not Jackson:

> [T]he following conversations have occurred between me and the jury:
>
> The jury was immediately taken to the courtroom next door. No attorneys were present. I would let defense counsel and the prosecutor in.
>
> The jurors were shaking. Some of them were crying. They asked me if they had come back into the courtroom at any point, and did the defendant have to be present when they came back into the courtroom.
>
> I informed the jury that at this point we would proceed as the law and good security required, and that I would not discuss the case any further with them, but that I wanted to personally assure them that how ever we proceeded they would be safe.
>
> I just needed them to be calm. I needed them to be composed. I needed them to be patient. And I needed to get them to a secure area.
>
> They were then placed in the jury room which had been locked.
>
> I have been in now twice to see them.
>
> When I saw them in the courtroom and further in the jury room, they immediately asked me if anybody was injured. They were very concerned about

14

defense counsel, and asked me if the defendant was all right, if the officers were all right.

I have been in there, and I told them, although there were a few scrapes and bruises, I didn't say on whom, everybody is basically fine; and they should just stay calm.

And then, again, I wouldn't discuss the case with them; but we would get back with them as soon as necessary security procedures were taken care of.

It is my legal position that the defendant has waived and forfeited his right to be present by his violent outburst and by his utter inability to even compose himself despite the fact that three officers were engaged in a struggle with him.

And really, the remaining question is simply how do we proceed?

I have to proceed.

(Tr. 789-91.) Over the objections of Jackson's defense counsel to proceeding in Jackson's absence, the jurors were polled and Justice Richter accepted the verdict. (Tr. 791-800.)

Before sentencing, Jackson moved pursuant to C.P.L. § 330.30 to set aside the verdict. (State Br. at 11.) Justice Richter granted the motion and set aside the second burglary count relating to Jackson's entry into Room 829. (State Br. at 12; see Dkt. No. 10: Sentencing Tr. ["S."] 2.)

Jackson's sentencing took place on July 24, 2002. (S. 1-27.) Jackson was represented by new counsel. (S. 1.) Jackson was found to be a second violent felony offender. (S. 4.) After statements from the prosector, Jackson's defense counsel and a lengthy statement from Jackson himself (S. 7-22), Justice Richter sentenced Jackson to thirteen years imprisonment (S. 23-26). Justice Richter noted that after watching Jackson during trial and sentencing:

15

[T]here are some – whether they be mental health, educational, or sheer logic issues.

There are just things that Mr. Jackson says that don't make sense, although he's very quick to perceive. . . .

I am mitigating the maximum sentence slightly because I think that Mr. Jackson has some overwhelming life problems that warrant some mitigation, . . . Mr. Jackson is unable in my opinion to control his own behavior. . . .

I urge the State Correctional authorities in what ever facility Mr. Jackson is being placed to eval[uate] his need, not only for drug treatment services, but for mental health services.

(S. 24-25.)

**Jackson's Direct Appeal**

In April 2004, represented by new counsel (the Center for Appellate Litigation), Jackson appealed to the First Department, claiming that: (1) Jackson's "constitutional and statutory rights to be present with counsel at all material stages of trial were violated by defense counsel's absence from supplementary instructions and [Jackson's] absence from the polling of the jury" (Dkt. No. 9: Rodriguez Aff. Ex. A: Jackson 1st Dep't Br. at 25-33); and (2) "[t]he court committed a significant and prejudicial error when it refused to instruct the jury . . . that the People were required to establish defendant entered the premises with the specific intent to commit the crime of larceny" rather than the general intent to commit a crime (Jackson 1st Dep't Br. at 34-39).

On March 8, 2005, the First Department affirmed Jackson's conviction, holding:

Since [Justice Richter's] communications [with the jury] were wholly unrelated to the substantive legal or factual issues of the trial, the court did not err in communicating with the jury outside the presence of defense counsel.

H:\OPIN\JACKSON-Daryl

> The court proceeded to poll the jury in the presence of defense counsel, but not defendant. By his behavior, defendant forfeited his right to be personally present. Given the extreme violence of and duration of the defendant's outburst, we conclude that the court was not obligated to offer defendant an opportunity to attend the polling of the jury upon a promise of good behavior.
>
> The court's charge concerning the element of intent to commit a crime was correct.

People v. Jackson, 16 A.D.3d 156, 156, 790 N.Y.S.2d 454, 455-56 (1st Dep't 2005) (citations omitted).

On May 25, 2005, the New York Court of Appeals denied leave to appeal. People v. Jackson, 4 N.Y.3d 887, 798 N.Y.S.2d 732 (2005).

**Jackson's Motion to Vacate the Judgment and Set Aside the Sentence**

On March 25, 2006, Jackson filed a pro se C.P.L. § 440.20 motion to set aside the sentence. (See Dkt. No. 1: Pet. Att.: Jackson Motion to Set Aside Sentence ["Jackson 440.20 Motion"].) Jackson argued, inter alia, that Justice Richter should have sua sponte ordered a mental competency examination because Jackson was mentally incompetent to stand trial. (Jackson 440.20 Motion at 2.) Jackson also filed a pro se C.P.L. § 440.10 motion to vacate the judgment. (See Pet. Att: Jackson Motion to Vacate Judgment ["Jackson 440.10 Motion"].) Jackson argued that: (1) the People presented "false" photographs of room 829 that differed from his first trial; (2) the People presented a "false witness," Joyce Bondoc, who was not the person at the front desk the day of the incident; and (3) the People presented an altered surveillance tape of Jackson in the building on a prior occasion. (Jackson 440.10 Motion at 1-2.)

On July 31, 2006, Justice Lewis Bart Stone denied both of Jackson's motions.  (Dkt. No. 9: Rodriguez Aff: Ex. I: Justice Stone Decisions.)  Denying Jackson's motion to vacate the verdict, Justice Stone held that "[a]ll of Jackson's [§ 440.10] claims are contained in the record, and therefore, should have been the subject of his appeal to the First Department which affirmed his conviction."  (Justice Stone Decision at 3.)  Because "the grounds upon which Jackson makes this motion appear on the record . . . [and] Jackson has proffered no justification for his failure to raise such grounds on his appeal, these claims are procedurally barred under CPL § 440.10."  (Justice Stone Decision at 3.)

Denying Jackson's motion to set aside the sentence, with respect to Jackson's claim that he was mentally incompetent to stand trial, Justice Stone noted that Jackson had

> At least two [mental health] examinations pursuant to CPL Article 730 . . . and that Jackson was committed to the Commissioner of Mental Hygiene for six months from August 2000 to February 2001.  Jackson was subsequently found fit to proceed. Jackson also fails to include any sworn affidavits from any of his attorneys or anyone else to support the claim that he was not competent during the trial.

(Justice Stone Decision at 5.)  Justice Stone also held that Jackson's claims regarding his competence did "not pertain to the legality of the sentence which can only be challenged under CPL § 440.20 on the grounds that it was 'unauthorized, illegally imposed or otherwise invalid as a matter of law.'" (Justice Stone Decision at 5-6.)  Justice Stone, however, held that even if Jackson properly raised the claim in his C.P.L. § 440.10 motion, the claims were based on facts in the record "and should have been raised on [direct] appeal."  (Justice Stone Decision at 6.)

H:\OPIN\JACKSON-Daryl

18

On June 20, 2007, the First Department denied leave to apeal from Justice Stone's denial of Jackson's §§ 440.10 and 440.20 motions. (Rodriguez Aff. Ex. M: 6/20/07 1st Dep't Order.)

**Jackson's Federal Habeas Corpus Petition**

Jackson's pro se federal habeas corpus petition alleges that: (1) Jackson was mentally incompetent and should have been given a competency hearing prior to his retrial (Dkt. No. 1: Pet. ¶ 13 & at 1-10); (2) the trial court erred when it denied Jackson's counsel's request to charge the jury that the prosecution was required to prove Jackson's specific intent to commit larceny (Pet. ¶ 13 at 11-29); (3) Jackson's constitutional rights were violated when the People introduced an altered surveillance video from a prior incident, not the date of the crime charged (Pet. ¶ 13 at 29-31); (4) Jackson's constitutional rights were violated when the prosecution produced a false witness (Pet. ¶ 13 at 31-33); and (5) Jackson's constitutional rights were violated when the prosecution presented misleading photos of Room 829 that prejudiced the jury (Pet. ¶ 13 at 33-42).

## ANALYSIS

### I.    THE AEDPA REVIEW STANDARD

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

H:\OPIN\JACKSON-Daryl

19

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[4]

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[5]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523.[6]  "That federal law, as defined by the

---

[4]  See also, e.g., Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (2002)).

[5]  Accord, e.g., Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[6]  Accord, e.g., Carey v. Musladin, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y]
(continued...)

Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d at 42. "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., Rodriguez v. Miller, 499 F.3d at 140; DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:

> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . . A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the

---

6/      (...continued)
appli[ed] clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); Lockyer v. Andrade, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); Rodriguez v. Miller, 499 F.3d 136, 140 (2d Cir. 2007) ("'Clearly established federal law' refers only to the holdings of the Supreme Court. No principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief. Leading by example, Musladin admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions.") (citations & fn. omitted), cert. denied, -- S. Ct. --, 2008 WL 102403 at *1 (U.S. Mar. 17, 2008); Howard v. Walker, 406 F.3d at 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003), cert. denied, 541 U.S. 1047, 124 S. Ct. 2171 (2004); Parsad v. Greiner, 337 F.3d at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Yung v. Walker, 341 F.3d 104, 109-110 (2d Cir. 2003); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[7]

        In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. at 413, 120 S. Ct. at 1523.[8] However, "[t]he term 'unreasonable' is . . . difficult to define." Williams v. Taylor, 529 U.S. at 410, 120 S. Ct. at 1522. The Supreme Court made clear that "an unreasonable application of federal law is different from an incorrect application of federal law." Id.[9] Rather, the issue is "whether the state court's

---

[7]    Accord, e.g., Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 123 S. Ct. at 1173-74; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; DelValle v. Armstrong, 306 F.3d at 1200; Yung v. Walker, 341 F.3d at 109; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

[8]    Accord, e.g., Brown v. Payton, 544 U.S. at 141, 125 S. Ct. at 1439; Wiggins v. Smith, 539 U.S. at 520, 123 S. Ct. at 2534-35; Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006), cert. denied, 127 S. Ct. 1383 (2007); Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d at 181.

[9]    See also, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (continued...)

application of clearly established federal law was objectively unreasonable."  Williams v. Taylor,

529 U.S. at 409, 120 S. Ct. at 1521.[10/]  "Objectively unreasonable" is different from "clear error."

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  However,

the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is

required . . . the increment need not be great; otherwise, habeas relief would be limited to state court

decisions so far off the mark as to suggest judicial incompetence.'"  Jones v. Stinson, 229 F.3d at 119

(quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).[11/]  "[T]he range of reasonable

---

[9/]     (...continued)
         (2002)); Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175; Hawkins v. Costello, 460
         F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v.
         Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at
         197; Eze v. Senkowski, 321 F.3d at 124-25; DelValle v. Armstrong, 306 F.3d at 1200 ("With
         regard to issues of law, therefore, if the state court's decision was not an unreasonable
         application of, or contrary to, clearly established federal law as defined by Section 2254(d),
         we may not grant habeas relief even if in our judgment its application was erroneous.").

[10/]    Accord, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v.
         Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct.
         at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti,
         537 U.S. at 25-27, 123 S. Ct. at 360-61; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir.
         2006), cert. denied, 128 S. Ct. 75 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v.
         Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122;
         Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303
         F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d
         at 128-29.

[11/]    Accord, e.g., Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v.
         Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at
         197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v.
         Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

judgment can depend in part on the nature of the relevant rule." <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 663, 124 S. Ct. at 2149.[12/] "Even if the state court issues a decision 'contrary to' clearly established February 25, 2008 Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" <u>Cousin</u> v. <u>Bennett</u>, 511 F.3d 334, 339 (2d Cir. 2008).

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 45.[13/]

---

[12/]    The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

<u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 663, 124 S. Ct. at 2149; <u>accord</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Miller</u>, 499 F.3d at 143; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243.

[13/]    <u>Accord</u>, <u>e.g.</u>, <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d at 591; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>see</u> <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the
(continued...)

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Mosby v. Senkowski, 470 F.3d at 519; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'" "Such a summary determination, even absent citation of federal case law, is a

---

13/    (...continued)
       difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

determination 'on the merits' and as such requires the deference specified by § 2254."  Moreover, "[I]f any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference."); but cf. Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (A "contrary-to-fact construction is not the same as an alternative holding. . . .  We decline to read a contingent observation as an 'adjudication on the merits.'"  De novo review applies in such a case.).

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues laid out in Coleman, Quirama and Sellan" – that is, "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." Jimenez v. Walker, 458 F.3d at 145 & n.16; accord, e.g., Clark v. Perez, 510 F.3d 382, 394 (2d Cir. 2008).  Using these three factors, the court should

> (1)    fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2)    fairly appearing to rest primarily on state procedural law.

> Absent a clear and express statement of reliance on a state procedural bar, the <u>Harris</u> presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim. Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d). The <u>Harris</u> presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar. Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar. No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

> The effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised. The middle ground . . . does not exist.

<u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145-46 (citations & fns. omitted); <u>accord</u>, <u>e.g.</u>, <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 242 ("In <u>Jimenez</u> v. <u>Walker</u>, we recently made clear that when a state court rejects a petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the adjudication rested on the merits."). Of course, "[i]f there is no [state court] adjudication on the merits [and no procedural bar], then the pre-AEDPA, <u>de novo</u> standard of review applies." <u>Cotto</u> v. <u>Herbert</u>, 331 F.3d 217, 230 (2d Cir. 2003); <u>see also</u> <u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); <u>accord</u>, <u>e.g.</u>, <u>Lynn</u>

v. <u>Bliden</u>, 443 F.3d at 246-47; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 220.  "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'"  <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181 (quoting § 2254(e)(1)); <u>accord</u>, <u>e.g.</u>, <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246-47.

## II.    JACKSON'S CLAIM THAT HIS CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE TRIAL COURT'S FAILURE TO ORDER A MENTAL COMPETENCY HEARING IS BARRED BY ADEQUATE AND INDEPENDENT STATE GROUNDS

Jackson claimed in his C.P.L. § 440.20 motion that Justice Richter should have ordered a competency hearing sua sponte because of (1) Jackson's documented history of mental illness and (2) evidence before Justice Richter that Jackson was not competent to stand trial.  (Dkt. No. 1: Pet. Att.: Jackson 440.20 Motion.)  Justice Stone ruled that Jackson's mental health claim was not supported by affidavits (from counsel or anyone else); did not relate to sentencing and so was not properly raised in a § 440.20 motion; and even if it had been raised in a § 440.10 motion, was based on facts in the record and thus should have been raised on direct appeal. (Dkt. No. 9: Rodriguez Aff. Ex. I: Justice Stone Decision at 5-6.)  The First Department denied leave to appeal from Justice Stone's decision.  (Rodriguez Aff. Ex. M: 6/20/07 1st Dep't Order.)

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the

federal claim will result in a fundamental miscarriage of justice." <u>Harris</u> v. <u>Reed</u>, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989) (citations & internal quotations omitted).<u>14/</u>

"[I]n order to preclude federal review [under the adequate and independent doctrine], the last state court to render judgment must 'clearly and expressly state . . . that its judgment rest[ed] on a state procedural bar.'" <u>Jones</u> v. <u>Vacco</u>, 126 F.3d at 415 (<u>quoting</u> <u>Glenn</u> v. <u>Bartlett</u>, 98 F.3d at 724). The Second Circuit has made clear that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." <u>Velasquez</u> v. <u>Leonardo</u>, 898 F.2d at 9; <u>accord</u>, <u>e.g.</u>, <u>Harris</u> v. <u>Reed</u>, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an <u>alternative</u> holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").<u>15/</u> Thus, "as long as the state court explicitly invokes a state procedural

---

<u>14/</u>    <u>See also</u>, <u>e.g.</u>, <u>Schlup</u> v. <u>Delo</u>, 513 U.S. 298, 314-16, 115 S. Ct. 851, 860-61 (1995); <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991); <u>Murray</u> v. <u>Carrier</u>, 477 U.S. 478, 485-88, 496, 106 S. Ct. 2639, 2644-45, 2649-50 (1986); <u>Jones</u> v. <u>Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997); <u>Garcia</u> v. <u>Lewis</u>, 188 F.3d 71, 76-77 (2d Cir. 1999); <u>Reyes</u> v. <u>Keane</u>, 118 F.3d 136, 138-40 (2d Cir. 1997); <u>Glenn</u> v. <u>Bartlett</u>, 98 F.3d 721, 724 (2d Cir. 1996), <u>cert. denied</u>, 520 U.S. 1108, 117 S. Ct. 1116 (1997); <u>Velasquez</u> v. <u>Leonardo</u>, 898 F.2d 7, 9 (2d Cir. 1990).

<u>15/</u>    <u>See</u>, <u>e.g.</u>, <u>Garcia</u> v. <u>Lewis</u>, 188 F.3d at 77-82; <u>Glenn</u> v. <u>Bartlett</u>, 98 F.3d at 724-25; <u>see also</u>, <u>e.g.</u>, <u>Santiago</u> v. <u>People</u>, 97 Civ. 5076, 1998 WL 803414 at *4 (S.D.N.Y. Oct. 13, 1998) ("When the state court rejects a claim both on the merits and because it was waived under the state's procedural law, review of the claim on a federal habeas corpus petition is barred.").

bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas." Harris v. Reed, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10.

Jackson's C.P.L. § 440.20 motion raised the same claim – that Justice Richter should have ordered a competency hearing sua sponte because of (1) Jackson's documented history of mental illness and (2) evidence before Justice Richter that Jackson was not competent to stand trial – that he now raises as a habeas claim. (Pet. ¶ 13 & at 1-10; Jackson 440.20 Motion.) Justice Stone ruled that Jackson's mental health claim was not supported by any affidavit from counsel or anyone else; did not relate to the legality of his sentence and so was not properly raised in a § 440.20 motion; and "[e]ven assuming Jackson is raising this ground in a motion to set aside the conviction [under C.P.L. § 440.10], . . . such facts were in the record and should have been raised on [direct] appeal." (Rodriguez Aff. Ex. I: Justice Stone Decision at 5-6.)

State courts are not required to use any particular language:

We encourage state courts to express plainly, in every decision potentially subject to federal review, the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim – every state appeal, every denial of state collateral review – in order that federal courts might not be bothered with reviewing state law and the record in the case.

Coleman v. Thompson, 501 U.S. at 739, 111 S. Ct. at 2559.

Furthermore, unlike the situation where the state court holds that claims were either unpreserved or without merit, which the Second Circuit has found is usually too ambiguous to

preclude habeas review,[16] here Justice Stone explicitly stated that Jackson's mental health claim was barred by three separate state procedural grounds.  The fact that Justice Stone also stated certain facts that appear to relate to the merits of this claim (e.g., that Jackson had a C.P.L. § 730 hearing and subsequently was found fit to proceed, see page 17 above), does not change the result.  See, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810-11 & n.4 (2d Cir. 2000) ("where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved"); Glenn v. Bartlett, 98 F.3d at 724-25 & n.3 (state decision which denied prosecutorial misconduct claim as not preserved for appellate review represented an independent and adequate state procedural ground even though court addressed merits of claim "in the interests of justice"); Velasquez v. Leonardo, 898 F.2d at 9 (state decision which denied claims as procedurally barred but then alternatively addressed merits rested on adequate and independent state grounds).  Thus, Justice Stone's decision here unambiguously rested on a state procedural ground.[17]

---

[16]     See, e.g., Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) ("We have found a state court's reliance on a state procedural bar to be ambiguous, and thus refused to invoke a procedural bar, where . . . the state court rejected defendant's claims on appeal as 'either meritless or unpreserved.'"); Tankleff v. Senkowski, 135 F.3d 235, 247 (2d Cir. 1998); Reid v. Senkowski, 961 F.2d 374, 377 (2d Cir. 1992).

[17]     The First Department denied leave to appeal from Justice Stone's decision.  (See page ___ above.)  The Supreme Court held in Ylst v. Nunnemaker, 501 U.S. 797, 111 S. Ct. 2590 (1991), with respect to unexplained orders, that federal habeas courts should presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Id. at 803, 111 S. Ct. at 2594.  Petitioner has presented no facts to rebut that
                                                                                          (continued...)

The Supreme Court has established that "the procedural bar doctrine only precludes habeas review when the state procedural ground is firmly established and regularly followed by the state courts." Simpson v. Portuondo, 01 Civ. 8744, 2002 WL 31045862 at *4 (S.D.N.Y. June 4, 2002) (citing James v. Kentucky, 466 U.S. 341, 348-49, 104 S. Ct. 1830, 1835 (1984)); accord, e.g., Clark v. Perez, 510 F.3d 382, 391 (2d Cir. 2008).

"[I]t is well-settled under New York law that where the record is sufficient to allow appellate review of a claim, the failure to raise that claim on [direct] appeal precludes subsequent collateral review of the claim." Pearson v. Greiner, 02 Civ. 10244, 2004 WL 2453929 at *9 (S.D.N.Y. Nov. 3, 2004) (citing New York cases); C.P.L. § 440.10(2)(c) ("[T]he court must deny a [§ 440.10] motion to vacate a judgment when: . . . Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him.").[18]

---

17/    (...continued)
       presumption here.

18/    Accord, e.g., Aparicio v. Artuz, 269 F.3d 78, 92-93 (2d Cir. 2001); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); Louis v. Fischer, No. 04-CV-2887, 2007 WL 4198255 at *21 (E.D.N.Y. June 25, 2007); Alston v. Donnelly, 461 F. Supp. 2d 112, 123 (W.D.N.Y. 2006); Serrano v. Senkowski, 02 Civ. 8708, 2004 U.S. Dist. LEXIS 18936 at *35-36 (S.D.N.Y. Sept. 23, 2004); Estwick v. Walker, 01 Civ. 2174, 2004 WL 1151581 at *6 (S.D.N.Y. (continued...)

Here, Jackson's claim regarding his competency to stand trial is entirely based on information in the record.  (See pages 14-15, 17 above.)  Accordingly, Jackson's first habeas claim, that he was not competent to stand trial, should be DENIED as procedurally barred by adequate and independent state law grounds.[19]

## III.    JACKSON'S JURY CHARGE CLAIM SHOULD BE DENIED

Jackson claims that he was deprived of due process when Justice Richter refused to charge the jury that Jackson needed the specific intent to commit larceny when he entered the Phillips Club in order to be guilty of burglary.  (Dkt. No. 1: Pet. ¶ 13 at 11-17.)

---

[18]    (...continued)
May 24, 2004); Larrea v. Bennett, 01 Civ. 5813, 2002 WL 1173564 at *14 & n.18 (S.D.N.Y. May 31, 2002) (Peck, M.J.) ("The Second Circuit has held C.P.L. § 440.10(2)(c) to be an adequate and independent state ground," citing cases), aff'd, 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002), aff'd, 368 F.3d 179 (2d Cir. 2004).

[19]    Because the Court finds this procedural ground to be an adequate and independent state law ground, the Court need not examine the other two procedural grounds for Justice Stone's denial of Jackson's C.P.L. § 440 motions.

Because there is an adequate and independent finding by the state court that Jackson procedurally defaulted on his mental competency claim, Jackson would have to show in his habeas petition "cause for the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. at 750, 111 S. Ct. at 2565; see also, e.g., Schlup v. Delo, 513 U.S. at 324-27, 115 S. Ct. at 865-67 (fundamental miscarriage of justice may be demonstrated by showing through "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence").  Jackson does not allege cause, prejudice or a fundamental miscarriage of justice.

A.    **Standard of Review of a State Court's Jury Instructions**

It is well-established that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102 (1990)).

As the Second Circuit has stated:  "'In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.'" Blazic v. Henderson, 900 F.2d 534, 540 (2d Cir. 1990) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)).[20/]  Failure to give a properly requested jury charge does not by itself violate a petitioner's right to due process. E.g., Blazic v. Henderson, 900 F.2d at 541 ("A mere error of state law does not deny a defendant his right to due process.").[21/]

"For an erroneous state jury charge to result in a federal constitutional deprivation, 'the ailing instruction by itself [must have] so infected the entire trial that the resulting conviction

---

[20/]    Accord, e.g., Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001); Sams v. Walker, 18 F.3d 167, 171 (2d Cir. 1994); see, e.g., Cupp v. Naughten, 414 U.S. 141, 146, 94 S. Ct. 396, 400 (1973).

[21/]    See also, e.g., Schaefer v. Leone, 443 F.2d 182, 185 (2d Cir.), cert. denied, 404 U.S. 939, 92 S. Ct. 277 (1971).

violates due process.'" <u>Blazic</u> v. <u>Henderson</u>, 900 F.2d at 541 (quoting <u>Cupp</u> v. <u>Naughten</u>, 414 U.S. at 147, 94 S. Ct. at 400); <u>see also</u>, <u>e.g.</u>, <u>Casillas</u> v. <u>Scully</u>, 769 F.2d 60, 63 (2d Cir. 1985); <u>Carmona</u> v. <u>Attorney Gen.</u>, 96 Civ. 8045, 1997 WL 876737 at *11 (S.D.N.Y. Oct. 7, 1997) ("Jury charges that contain errors, even if they lead to the jury misapplying state law, do not ordinarily give rise to federal habeas corpus relief in non-capital cases. . . . Rather, an erroneous jury charge must have 'infected the entire trial' to be a cognizable claim in a habeas corpus proceeding."), <u>report & rec. adopted</u>, 1998 WL 213781 (S.D.N.Y. Apr. 29, 1998).

### B.    Application of the Standard to Jackson's Claim

Jackson asserts that, in refusing to charge the jury that when he entered the Phillips Club he had to have intended to commit larceny in order to be convicted of burglary, Justice Richter violated his right to a fair trial under the Fourteenth Amendment.  (Dkt. No. 1: Pet. ¶ 13 at 11-17.) The First Department held that "[t]he court's charge concerning the element of intent to commit a crime was correct." <u>People</u> v. <u>Jackson</u>, 16 A.D.3d 156, 156, 790 N.Y.S.2d 454, 455-56 (1st Dep't 2005).

The Second Circuit has recognized that "[c]ontrary to the rule in most states, . . . New York's burglary statute does not require proof of [any] specific intent." <u>DeVonish</u> v. <u>Keane</u>, 19 F.3d 107, 109 (2d Cir.) (citing <u>People</u> v. <u>Mackey</u>, 49 N.Y.2d 274, 280, 425 N.Y.S. 2d 288, 291 (1980)), <u>cert. denied</u>, 513 U.S. 841, 115 S. Ct. 128 (1994).  The Second Circuit further held that:

> "In order to secure a conviction for burglary, the People need only allege a knowing and unlawful entry coupled with an intent to commit a crime therein. There is no requirement that the People allege or establish what particular crime was intended, or that the intended crime actually be committed."

Devonish v. Keane, 19 F.3d at 109 (quoting People v. Mahboubian, 74 N.Y.2d 174, 193, 544 N.Y.S. 2d 769, 779 (1989)).

Because Justice Richter instructed the jury in accordance with New York law, no federal Constitutional violation occurred.  Jackson's jury charge habeas claim should be DENIED.

### C.     Jackson's Jury Charge Claim Asserting Jury Confusion Should Be Denied As Unexhausted But Deemed Exhausted and Procedurally Barred

Jackson's jury charge habeas claim further asserts that Jackson's due process rights were violated because the jury was confused by Justice Richter's charge.  (Pet. ¶ 13 at 23-29.) Jackson, however, never raised a jury confusion claim on appeal or via a C.P.L. § 440 motion in state court.  Thus, any such claim is unexhausted but deemed exhausted and procedurally barred.

### 1.     The Exhaustion Doctrine:  Background

Section 2254 codifies the exhaustion requirement, providing that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A).[22/]  As the Supreme Court has made clear, "[t]he exhaustion doctrine is principally designed to protect the state courts' role in the enforcement

---

[22/]     See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999); Rose v. Lundy, 455 U.S. 509, 515-16, 102 S. Ct. 1198, 1201 (1982) ("The exhaustion doctrine existed long before its codification by Congress in 1948" in 28 U.S.C. § 2254.); Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054, 115 S. Ct. 1436 (1995); Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990); Daye v. Attorney Gen., 696 F.2d 186, 190-94 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048, 104 S. Ct. 723 (1984).

36

of federal law and prevent disruption of state judicial proceedings." Rose v. Lundy, 455 U.S. at 518, 102 S. Ct. at 1203; accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 845, 119 S. Ct. at 1732.

The Second Circuit determines whether a claim has been exhausted by applying a two-step analysis:

> First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts. . . . Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim.

Diaz v. Coombe, 97 Civ. 1621, 1997 WL 529608 at *3 (S.D.N.Y. June 12, 1997) (Mukasey, D.J. & Peck, M.J.) (quoting Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981)); accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 843-48, 119 S. Ct. at 1732-34.

"The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney Gen., 696 F.2d at 191.[23/] The Second Circuit has held that a federal habeas petitioner must have alerted the state appellate court that a federal constitutional claim is at issue. E.g., Cox v. Miller, 296 F.3d at 99; Jones v. Vacco, 126 F.3d at 413-14; Grady v. LeFevre, 846 F.2d 862, 864 (2d Cir. 1988); Petrucelli v. Coombe, 735 F.2d 684, 688-89 (2d Cir. 1984); Daye v. Attorney Gen., 696 F.2d at 191.  In Daye, the Second Circuit en banc stated:

---

[23/]    Accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 844, 119 S. Ct. at 1732; Picard v. Connor, 404 U.S. at 275-76, 92 S. Ct. at 512; Jones v. Keane, 329 F.3d 290, 294-95 (2d Cir.), cert. denied, 540 U.S. 1046, 124 S. Ct. 804 (2003); Cox v. Miller, 296 F.3d 89, 99 (2d Cir. 2002), cert. denied, 537 U.S. 1192, 123 S. Ct. 1273 (2003); Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997).

> [T]he ways in which a state defendant may fairly present to the state courts the
> constitutional nature of his claim, even without citing chapter and verse of the
> Constitution, include (a) reliance on pertinent federal cases employing constitutional
> analysis, (b) reliance on state cases employing constitutional analysis in like fact
> situations, (c) assertion of the claim in terms so particular as to call to mind a specific
> right protected by the Constitution, and (d) allegation of a pattern of facts that is well
> within the mainstream of constitutional litigation.

Daye v. Attorney Gen., 696 F.2d at 194.[24/]

> **2.    Jackson's Jury Confusion Claim Was Not Presented To The State
>        Courts And Thus Is Unexhausted But Deemed Exhausted And
>        Procedurally Barred**

On appeal, Jackson only raised a claim as to the jury charge's intent element; he did

not raise the jury confusion claim that he now asserts in his federal habeas petition.  (See pages 14-

15, 35 above.)  His present federal due process jury confusion claim thus was not raised on direct

appeal, although it certainly could have been.

"'For exhaustion purposes, "a federal habeas court need not require that a federal

claim be presented to a state court if it is clear that the state court would hold the claim procedurally

barred."'"  Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (quoting Grey v. Hoke, 933 F.2d 117,

120 (2d Cir. 1991) (quoting Harris v. Reed, 489 U.S. 255, 263 n.9, 109 S. Ct. 1038, 1043 n.9

---

[24/]    Accord, e.g., Smith v. Duncan, 411 F.3d 340, 348 (2d Cir. 2005); Jackson v. Edwards, 404
F.3d 612, 618 (2d Cir. 2005); Rosa v. McCray, 396 F.3d 210, 217-18 (2d Cir.), cert. denied,
126 S. Ct. 215 (2005); St. Helen v. Senkowski, 374 F.3d 181, 182-83 (2d Cir. 2004), cert.
denied, 543 U.S. 1058, 125 S. Ct. 871 (2005); Cox v. Miller, 296 F.3d at 99; Ramirez v.
Attorney Gen., 280 F.3d 87, 95 (2d Cir. 2001); Levine v. Comm'r of Corr. Servs., 44 F.3d
121, 124 (2d Cir. 1995), cert. denied, 520 U.S. 1106, 117 S. Ct. 1112 (1997); Grady v.
LeFevre, 846 F.2d at 864; Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986); Petrucelli
v. Coombe, 735 F.2d at 688.

(1989))).[25/]  "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)."  Grey v. Hoke, 933 F.2d at 120. Consequently, such procedurally barred claims are "deemed exhausted" by the federal courts.  E.g., St. Helen v. Senkowski, 374 F.3d at 183; DiGuglielmo v. Smith, 366 F.3d at 135; McKethan v. Mantello, 292 F.3d at 122-23; Ramirez v. Attorney Gen., 280 F.3d at 94; Reyes v. Keane, 118 F.3d at 139; Bossett v. Walker, 41 F.3d at 828; Washington v. James, 996 F.2d 1442, 1446-47 (2d Cir. 1993), cert. denied, 510 U.S. 1078, 114 S. Ct. 895 (1994); Grey v. Hoke, 933 F.2d at 120-21.

---

[25/]  Accord, e.g., Castille v. Peoples, 489 U.S. 346, 350, 109 S. Ct. 1056, 1059 (1989) ("It would be inconsistent with [§ 2254(b)], as well as with underlying principles of comity, to mandate recourse to state collateral review whose results have effectively been predetermined"); St. Helen v. Senkowski, 374 F.3d 181, 183 (2d Cir. 2004) ("even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it has become procedurally barred under state law."); DiGuglielmo v. Smith, 366 F.3d 130, 135 (2d Cir. 2004) (petitioner's procedurally defaulted claims deemed exhausted where he could no longer obtain state-court review because of his procedural default); McKethan v. Mantello, 292 F.3d 119, 122-23 (2d Cir. 2002) (claims deemed exhausted where they were "procedurally barred for not having been raised in a timely fashion"); Ramirez v. Attorney Gen., 280 F.3d 87, 94 (2d Cir. 2001); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) ("[I]f the petitioner no longer has 'remedies available' in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted."), cert. denied, 514 U.S. 1054, 115 S. Ct. 1436 (1995).

39

It is clear that Jackson is now barred from raising a due process jury confusion claim in state court because such a claim could have been raised on direct appeal, but was not.[26/]  As the Second Circuit explained in Washington v. James:

> Consequently, we do not believe [petitioner] has fairly presented to the state courts his constitutional objection. . . . [T]he state courts have not had an opportunity to address the federal claim raised on habeas review and this normally would preclude our review of that claim.
>
> . . . .
>
> As we have already noted, this preclusion is not technically the result of a failure to exhaust state remedies, but is due to a procedural default.  [Petitioner] no longer has the right to raise his claim under New York law either on direct appeal, see McKinney's 1993 Revised N.Y. Court Rules § 500.10(a), or on collateral review. New York's collateral procedures are unavailable because [petitioner] could have raised the claim on direct review but did not. See N.Y. Crim. Proc. Law § 440.10(2)(c).  Therefore [petitioner] has no further recourse in state court.  See 28 U.S.C. § 2254(c); Grey v. Hoke, 933 F.2d [at] 120. . . . Because he failed to raise his claim in state court and no longer may do so, his claim is procedurally defaulted.

996 F.2d at 1446-47.[27/]

_____

[26/]    C.P.L. § 440.10(2)(c) states, in pertinent part:

> 2.  Notwithstanding the provisions of subdivision one, the court must deny a motion to vacate a judgment when:
>
> . . . .
>
> (c)  Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to . . .  raise such ground or issue upon an appeal actually perfected by him . . . .

[27/]    See also, e.g., Galdamez v. Keane, 394 F.3d 68, 73-74 (2d Cir.) ("a petitioner cannot claim
(continued...)

To avoid a procedural default on his unexhausted claim Jackson would have to "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claims will result in a 'fundamental miscarriage of justice,'" i.e., a showing of "actual innocence." Harris v. Reed, 489 U.S. at 262, 109 S. Ct. at 1043 (citations omitted); accord, e.g., Schlup v. Delo, 513 U.S. 298, 324-27, 115 S. Ct. 851, 865-67 (1995); Coleman v. Thompson, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991).[28]

Jackson has not alleged cause and prejudice nor has he made a showing of actual innocence. Thus, Jackson's unexhausted due process claim should be DENIED as barred from habeas review.

------

[27]    (...continued)
to have exhausted his or her remedies by dint of no longer possessing 'the right under the law of the State to raise, by any available procedure, the question presented,' if at some point the petitioner had that right but failed to exercise it.") (citation omitted), cert. denied, 544 U.S. 1025, 125 S. Ct. 1996 (2005); DiGuglielmo v. Smith, 366 F.3d at 135 (Second Circuit affirmed denial of petitioner's habeas claim because "his claims were not properly exhausted and . . . his procedural default is not excusable."); Jones v. Keane, 329 F.3d 290, 296 (2d Cir.) ("[Petitioner] has procedurally defaulted his vagueness claim since New York's procedural rules now bar [petitioner] from raising it in New York courts. Further direct review by the Court of Appeals is no longer available. . . ."), cert. denied, 540 U.S. 1046, 124 S. Ct. 804 (2003); Reyes v. Keane, 118 F.3d at 139 ("Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record.") (emphasis added).

[28]    See also, e.g., Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); Smith v. Duncan, 411 F.3d 340, 347 (2d Cir. 2005); DeBerry v. Portuondo, 403 F.3d 57, 64 (2d Cir.), cert. denied, 546 U.S. 884, 126 S. Ct. 225 (2005); St. Helen v. Senkowski, 374 F.3d at 183-84; DiGuglielmo v. Smith, 366 F.3d at 135; Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996), cert. denied, 520 U.S. 1108, 117 S. Ct. 1116 (1997); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

**IV.  JACKSON'S CLAIM THAT HIS CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE TRIAL COURT'S ADMISSION OF CERTAIN EVIDENCE IS BARRED BY ADEQUATE AND INDEPENDENT STATE GROUNDS**

Jackson's habeas petition (Pet. ¶ 13 at 29-42) raises the same claims that Jackson brought in his C.P.L. § 440.10 motion – that his constitutional rights were violated when the prosecution:  (1) introduced an altered surveillance video from a prior incident, not the date of the crime charged; (2) produced a false witness; and (3) presented misleading photos of Room 829.  (See pages 1-2, 18 above.)  Justice Stone ruled that "[a]ll of Jackson's [evidentiary] claims are contained in the record and, therefore, should have been the subject of his appeal to the First Department which affirmed his conviction."  (Dkt. No. 9: Rodriguez Aff. Ex. I: Justice Stone Decision at 3.)  Justice Stone added that because Jackson "proffered no justification for his failure to raise such grounds on his [direct] appeal, these claims are procedurally barred under CPL § 440.10."  (Justice Stone Decision at 3.)  Justice Stone's decision here unambiguously rested on a state procedural ground that is firmly established and regularly followed.  (See discussion and cases cited at pages 27-32 above.)  Nor does Jackson allege cause, prejudice or a fundamental miscarriage of justice.  (See page 32 n.19 above.)

Jackson's claims regarding allegedly false and misleading evidence are based entirely on information in the record.  (See pages 5 n.2, 7 above.)  Accordingly, Jackson's third, fourth, and fifth habeas claims should be DENIED as procedurally barred by adequate and independent state grounds.

## CONCLUSION

For the reasons set forth above, Jackson's habeas petition should be <u>DENIED</u> and a certificate of appealability should not be issued.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley III, 500 Pearl Street, Room 2210, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Pauley (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas</u> v. <u>Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985); <u>IUE AFL-CIO Pension Fund</u> v. <u>Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988);

43

<u>McCarthy</u> v. <u>Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72, 6(a), 6(e).


Dated:       New York, New York
             April 24, 2008

                                          Respectfully submitted,

                                          _____
                                          **Andrew J. Peck**
                                          United States Magistrate Judge


Copies to:    Daryl Jackson
              Leilani Rodriguez, Esq.
              Judge William H. Pauley III